**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 24-cr-00520-TJK |
| ) | |
| MARCEL VINES, ) | |
| ) | |
| Defendant. ) | |

### DEFENDANT VINES SENTENCING MEMORANDUM

### I. INTRODUCTION

Marcel Vines appears before this Court for sentencing on a contraband-introduction offense committed while in custody. He does not dispute the seriousness of the conduct. He understands that bringing prohibited substances and items into a detention facility undermines safety and order, and that it warrants punishment. But he asks this Court to impose a sentence that is sufficient to address the conduct, without becoming greater than necessary in light of his unique circumstances.

Mr. Vines is already serving a mandatory life sentence plus 60 years for unrelated offenses. The government seeks the high end of the advisory range—46 months—to run consecutively. The defense respectfully submits that a 37-month sentence at the low end of the range, and to run concurrently, better serves the purposes of 18 U.S.C. § 3553(a). At this stage in his life and custodial reality, the difference between 37 and 46 months has no meaningful deterrent or public-safety impact, but it may have real consequences for his ability to access programming and contribute positively to his institutional environment.

The Court's task is not to punish past unrelated crimes again, but to impose a measured sentence for this offense. A 37-month term is more than symbolic—it is a significant sanction when layered on top of a life sentence—but it stops short of unnecessary and excessive punishment. It reflects a careful, individualized application of the § 3553(a) factors to the facts of this case and the person before the Court.

## II. NATURE AND CIRCUMSTANCES OF THE OFFENSE

The contraband scheme involved prohibited substances, including fentanyl, cell phones, and a knife, introduced into the D.C. Jail through corrupt staff and civilian intermediaries. Mr. Vines acknowledges that such items pose risks in a correctional environment and that his role in facilitating their entry was a violation of law and institutional trust. The Court is justified in treating the conduct as serious.

However, it is important to distinguish this offense from cases where contraband directly caused injury, death, or large-scale disruption. Here, there is no evidence that any overdose or assault flowed from the specific items attributed to Mr. Vines. While the government emphasizes the broader dangers of fentanyl in custody, sentencing should focus on the proven scope of the defendant's conduct. This case is about a breach of rules and potential risk, not actualized harm.

The setting also matters. Mr. Vines had been in maximum-security pretrial detention for over six years at the time of the offense. Such environments are marked by limited programming, constant tension, and close proximity to co-defendants and associates from the same neighborhood group. This context does not excuse his actions, but it explains the pressures and influences that contributed to his poor decision-making. His involvement was neither a spontaneous impulse nor the act of a career drug trafficker operating in the community—it was a lapse within the confines of an already hopeless custodial situation.

## III. HISTORY AND CHARACTERISTICS OF THE DEFENDANT

Mr. Vines' life story, as reflected in the PSR, is one of early adversity and limited access to stabilizing influences. Raised in an environment where violence and substance abuse were common, he entered the juvenile justice system at just 16. Those early cases—possession of marijuana, unauthorized use of a vehicle—reflected youthful impulsivity rather than deeply ingrained violent

2

behavior. Without consistent mentoring, educational support, or community programs, his contact with the justice system became cyclical.

By his late teens and early twenties, the stakes of his offenses escalated, culminating in the extremely serious conduct for which he now serves a life sentence. Those events will define his custodial status for the rest of his life, but they should not predetermine every sentencing outcome. Even individuals with the gravest prior convictions retain the right to have each new offense judged on its own facts, with punishment proportionate to that conduct.

There are also positive markers in Mr. Vines' history. While incarcerated on earlier cases, he earned his GED, completed vocational training in areas such as food service and manufacturing, and participated in life-skills courses like financial literacy and job interview preparation. He worked as an orderly and in UNICOR cable production. These efforts, though modest in the larger context, show that he is capable of constructive participation when given structured opportunities—a capacity the Court can foster through a sentence that leaves space for engagement rather than imposing purely symbolic additional time.

## IV. PERSONAL BACKGROUND AND MITIGATING CIRCUMSTANCES

The PSR describes a childhood lacking in stability and consistent parental guidance. His family life was disrupted by poverty, substance abuse, and exposure to neighborhood violence. His early contact with drugs—both in his environment and through peers—was a constant reality, shaping his worldview before he reached adulthood. School engagement was sporadic, and without a strong support system, he fell into the influence of older peers involved in criminal activity.

This backdrop is not an excuse, but it is relevant mitigation under § 3553(a)(1)'s directive to consider "the history and characteristics of the defendant." The conditions that shaped Mr. Vines' early life are directly connected to the choices and associations that have followed him into adulthood. A sentencing court is entitled to weigh the reality that a person who grows up in such

conditions faces far steeper odds of avoiding the justice system than those with greater resources and stability.

Additionally, Mr. Vines' ability to achieve his GED and complete vocational programs while in custody demonstrates resilience and adaptability despite his life sentence. He has the capacity to follow rules and complete tasks when incentivized and supervised. A sentence at the low end of the guidelines will not absolve his misconduct, but it will acknowledge that there remains value in keeping him connected to programming and positive institutional roles.

## V. NEED FOR THE SENTENCE IMPOSED

### A. To reflect seriousness, promote respect, and provide just punishment.

A 37-month sentence is a real consequence—especially when served under maximum-security conditions—yet it avoids tipping into punitive excess that cannot achieve additional deterrence or rehabilitation. It sends a message to Mr. Vines and to others that contraband offenses will be prosecuted and punished, but it does so without ignoring the reality of his existing life term.

### B. To afford adequate deterrence.

Deterrence in this case derives from the certainty of prosecution, not from squeezing every possible month out of the guideline range. For Mr. Vines, the knowledge that new misconduct will result in additional punishment—on top of life—is already a strong disincentive. For others, the prosecution of a high-profile inmate sends a message that status offers no immunity. The marginal difference between 37 and 46 months will not amplify that message.

### C. To provide needed training or treatment.

A shorter, concurrent sentence maximizes Mr. Vines' ability to participate in institutional programming. Lengthy consecutive sentences for lifers may disqualify them from certain educational or vocational opportunities, undermining the rehabilitative goals of sentencing. A low-

end sentence recognizes that keeping even life-sentenced prisoners constructively occupied benefits the institutions where they live and work.

## VI. PROTECTION OF THE PUBLIC

From the standpoint of community safety, Mr. Vines will never again live outside a secure facility. The public is protected from any risk he poses by virtue of his life sentence. In that sense, the "public" implicated here is the institutional population—staff and inmates—within the Bureau of Prisons.

The BOP has robust administrative measures to address inmate misconduct, including increased security classification, loss of privileges, and placement in special housing. These tools exist independently of judicial sentencing and can be deployed whenever needed. Additional months beyond the low end of the guideline range do not meaningfully enhance these protections.

Moreover, piling on consecutive time for someone who will never be released risks diluting the moral force of sentencing. If every offense automatically draws the harshest possible sanction, regardless of actual incremental risk, the process can appear mechanical rather than individualized, which undermines respect for the law. A measured, low-end sentence affirms that courts still weigh proportionality and fairness, even for those serving life.

## VII. REHABILITATION

Some may view rehabilitation as irrelevant for a person serving life, but that perspective overlooks the institutional benefits of engaged, constructive inmates. Lifers can serve as mentors, work program participants, and stabilizing forces within the prison community when given incentives to do so. A sentence that keeps Mr. Vines eligible for programming sooner rather than later supports these aims.

His track record shows that he can respond to structured opportunities: completing his GED, working steady prison jobs, and participating in educational courses. These are the kinds of

5

activities that reduce misconduct, improve institutional morale, and model positive behavior for younger inmates.

Extending his punishment beyond what is necessary risks pushing him further into disengagement and hopelessness, which is counterproductive for both him and the institutions tasked with housing him for life. A 37-month, concurrent sentence keeps him connected to the constructive side of prison life while still imposing meaningful accountability for his actions.

## VIII. AVOIDING UNWARRANTED SENTENCING DISPARITIES

Nationally, contraband-introduction cases with no proven direct harm often result in sentences at or near the low end of the range, particularly when the defendant is already in custody for unrelated offenses. Imposing the high end here would treat Mr. Vines more harshly than similarly situated defendants, without a principled reason grounded in the facts of this case.

His criminal history is already incorporated into the guideline calculation. Using it again to justify the top of the range risks double counting. The purpose of § 3553(a)(6) is to ensure that defendants with similar records and conduct receive similar sentences, not to create an ever-escalating penalty for those with serious past convictions when the present offense is less severe.

A 37-month sentence aligns with proportionality, avoids unwarranted disparities, and reflects a sentencing philosophy that punishes the conduct before the Court without reflexively re-litigating prior crimes already sanctioned with the harshest available penalty.

## IX. CONCLUSION

For all of the reasons above, Mr. Vines respectfully requests that the Court impose a sentence of **37 months** at the bottom of the guideline range, to run **concurrently** with his existing sentence. Such a sentence satisfies the statutory directive to impose punishment "sufficient, but not greater than necessary," reflects the seriousness of the offense, protects the public, promotes respect for the law, and preserves the possibility of continued rehabilitation and constructive institutional

Respectfully submitted,

MARCEL VINES
By Counsel

 /s/ Pleasant S. Brodnax, III
Pleasant S. Brodnax, III
1701 Pennsylvania Avenue, NW
Suite 200
Washington, D.C. 20006
(202) 462-1100
pleasant.brodnax@gmail.com

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing motion was filed by CM/ECF on the 8th day of August 2025, which will send a notification of such filing (NEF) to all counsel of record.

/s/ Pleasant S. Brodnax, III
Pleasant S. Brodnax, III